UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CR00067 CAS (AGF) |
| | ) | |
| JAMES MICHAEL CARMI, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendant, James Michael Carmi. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). At issue before the Court is Defendant's motion to suppress evidence (Doc. #17).[1] An evidentiary hearing was held on March 10, 2009. The government was represented by Assistant United States Attorney James C. Delworth. Defendant was present and represented by his attorney, Robert Herman. At the hearing, the government presented the testimony of Special Agent Dean Duke, an agent with the Drug Enforcement Administration (DEA), who was cross-examined extensively by defense counsel. The parties thereafter filed post-hearing briefs. Based

---

[1] Defendant also filed a motion to suppress statements (Doc. # 16), but noted at the hearing that the only statement made by Defendant was pursuant to a proffer letter. As the government agreed that it would adhere to the representations contained in the proffer letter, Defendant acknowledged that his motion to suppress statements was moot.

on the testimony and evidence adduced, and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Special Agent ("SA") Duke has been employed as an agent with DEA for 22 years. In late 2007 and early 2008, he and other agents were involved in a narcotics investigation involving Defendant Carmi and his residence at 259 O'Brien Road, in Elsberry, Missouri (the "Residence"). In connection with that investigation, on February 11, 2008, SA Duke presented an application and affidavit in support of a search warrant of the Residence. (Govt. Ex.1). SA Duke attested to the information contained in the affidavit before Magistrate Judge Mary Ann L. Medler, and Judge Medler issued a search warrant based on the affidavit on February 11, 2008, at 12:46 p.m. (Govt. Ex. 2). The search warrant authorized the search of 259 O'Brien Road, described in material part as "a large pole barn equipped with an approximate 1,800 square foot apartment . . . The building is a free standing structure with dog kennels attached to the rear of the building. . . . The door to the residence, which is on the second floor, is located at the northwest corner of the structure." Id.

### The Search Warrant Affidavit

In the affidavit in support of the search warrant, SA Duke stated that he was part of a team of experienced narcotics agents who had been investigating the criminal activities of a drug trafficking organization (the "DTO") that obtained kilogram levels of

2

marijuana from sources of supply in Texas, and distributed the marijuana in St. Louis through a network of distributors. Describing the genesis of the investigation, SA Duke stated that in December, 2007, officers of the police departments in Maryland Heights and Troy, Missouri, initiated a joint investigation into a DTO operating between their two communities. Officers of the Troy Police Department had received information indicating that Defendant Carmi was supplying marijuana to an individual named Scott Richards, who was in turn distributing marijuana to subjects in Maryland Heights and elsewhere. The Troy police officers advised the Maryland Heights police that the investigation revealed a possible storage location in Maryland Heights. The Troy police officers further revealed that Carmi and Richards were transporting the marijuana from Texas to Maryland Heights, Missouri, where it was stored, and the information they received indicated that approximately 100 to 200 pounds of marijuana was delivered two to three times a month.

On December 7, 2007, Troy police officers advised the Maryland Heights police that a delivery of marijuana was reportedly going to occur, and that Richards was leaving his place of work at Barnes Hospital before accepting the delivery. Maryland Heights officers responded to the location, located the vehicle belonging to Richards, and conducted surveillance. They observed Richards enter his car and drive to a bar in the City of St. Louis, where he met with another subject later identified as Larry Wheeler. Wheeler and Richards then left the bar and were followed as they drove to Maryland Heights. The two parted company at a local business on the corner, and the police

3

followed Richards to the "Nuts Bar," which he entered for a short time. Richards then went to the rear of the business, where he removed a package from the back of a white Ford truck, later identified as the vehicle of Jeffrey Sebastian. Richards then left and met with Wheeler. He provided Wheeler with a package, and then the two departed in different directions. Both vehicles were followed by the investigative team, and stopped. Richards was found to be in possession of approximately seven pounds of marijuana, and Wheeler was found to be in possession of approximately three pounds of marijuana. According to informant information from the Troy police, this marijuana was part of a larger delivery that Carmi had just received from an unknown supplier in Texas.

The followup investigation led the police to Sebastion, who gave the officers consent to search his residence. No contraband was located, but the officers found two large duffle bags and a large cooler which were contaminated with an extremely strong odor of raw marijuana. Sebastian was advised of the investigation and interviewed, and at that time he stated that although the officers had a good case against Carmi, he would remain silent until he could speak with an attorney.

The officers conducted an interview with Richards, who said he had met Carmi approximately seven years earlier through his (Richards') wife. He stated that Carmi always had large sums of money that he frequently flaunted, and that Richards had observed in excess of $100,000 in currency at Carmi's residence, which he identified as 259 O'Brien Road. The date when Richards observed the cash at the Residence was not identified in the search warrant. Richards also stated that Carmi was into guns and other

high ticket items such as motorcycles, and that in the past Carmi would routinely shoot 500 caliber machine guns on the property of his Residence.

Richards stated that in June, 2007, Carmi contacted him and asked him to deliver marijuana for him. He agreed, and began both to deliver marijuana and distribute cash for Carmi. He was paid $150 per pound, for each pound of marijuana delivered. He also stated that he sold marijuana for Carmi, and was paid $800 per pound sold. He stated that over the past six month he made 15 - 20 trips for Carmi, each consisting of 10 - 15 pounds of marijuana, and admitted that he had delivered and sold approximately 150 - 200 pounds of marijuana for Carmi.

Richards stated that Carmi took delivery of 100 - 150 pounds of marijuana 3 to 4 times a month, and he detailed the method of delivery. Carmi would meet the drivers, who were from Texas, one of whom he identified by name, at the Waffle House restaurant in Maryland Heights. Richards did not attend the meetings, but Carmi would tell him about them. Carmi would then contact Richards and tell him when the marijuana was ready. Carmi would then direct him to contact Sebastian at the Nuts Bar in Maryland Heights. Sebastian would be at the bar and his white Ford truck would be parked in the rear of the bar. Richards would meet Sebastian in the bar, and Sebastian would have him retrieve the marijuana from the truck. As expressly recited in the affidavit, this information was verified by the officers' surveillance on December 7, 2007. Richards would then pick up the marijuana and take it to Carmi at locations either near Bowling Green, Missouri or Carmi's Residence. Richards stated that he believed Carmi

stored the marijuana in his apartment, which was somewhere near the bar.

The affidavit also detailed information the officers received from Wheeler. On December 18, 2007, Wheeler contacted the Maryland Heights police and stated that he wished to provide additional information regarding Defendant Carmi. He stated that he had met Carmi through Richards in June or July of 2007. Carmi was meeting Richards to pick up money from marijuana sales, and Wheeler later learned Richards sold marijuana for Carmi. Richards asked Wheeler if he wanted to make money distributing marijuana for Carmi, and he later agreed. Richards and Carmi told him that they received 100 to 200 pounds of marijuana every couple of weeks. Wheeler provided details as to the price per pound and his own involvement, including that he counted money on four to five occasions for Carmi, noting that each time there was $3,000 to $5,000.

Wheeler also advised the officers that the first time he met Carmi, Carmi asked him to intimidate a witness on a pending stealing case, offering to pay Wheeler $1,000 to beat up the loss prevention officer of a store, to assure the store officer would not testify against him. Carmi was concerned about returning to federal prison. Carmi repeatedly talked to Wheeler about the request, but Wheeler stated that he did not do what Carmi asked.

In September or October, 2007, Carmi approached Wheeler about picking up loads of marijuana from Texas, offering to pay between $10,000 to $20,000 per trip. Carmi stated that he would provide a vehicle for Wheeler to drive to Arkansas. Once there, a switch would be made to a vehicle with Arkansas plates, which he would use to drive to

Texas. In Texas, he would pick up a load vehicle, that was already loaded with marijuana. He would drive this vehicle to Arkansas, transfer the load to the Missouri vehicle, and then drive that car to a location determined by Carmi. Carmi stated that he transported 100 to 200 pounds of marijuana to Missouri from Texas every couple of weeks. Wheeler advised the officers that he considered, but never accepted, the offer, and never made the trips.

Wheeler described the DTO, stating that Carmi was the leader who arranged the deliveries; Sebastian accepted delivery and stored the marijuana; and Richards arranged to deliver the marijuana to several persons in the St. Louis area, including Wheeler, to distribute. He stated that Carmi continually bragged about making $10,000 to $12,000 per week from the sale of marijuana.

On February 1, 2008, Richards provided further information regarding Carmi's distribution practices in a proffer interview with counsel. He detailed the role of Carmi's son, and related information provided by Carmi regarding a subject in Warrenton who would take 75 to 100 pounds of marijuana from Carmi at a time. Carmi had asked Richards to deliver to this individual, but he declined.

Richards stated he had been to Carmi's Residence, and was last there a few days prior to his December 7, 2007 arrest. He described a large bank vault in the barn where Carmi stored stolen property, large sums of currency, and a log book where he recorded information regarding his marijuana transactions. He specifically described where the log book and currency were kept inside the bank vault.

7

Richards further stated that Carmi was under investigation for a theft from Orschelyn's in Troy, Missouri, and that Carmi and his youngest son were caught and facing charges. He stated that Carmi offered his juvenile son $5,000 to say he had acted alone, to prevent Carmi from having his federal parole revoked, and that Carmi had offered Richards and a co-defendant money to beat up the loss prevention officer to prevent him from testifying.

Richards stated that Carmi bragged about his home and property, and told him that the "feds" could not touch his property because he had put his property, including this residence, property, and numerous motorcycles, in the names of family members. As recited in the affidavit, this information was checked, and the officers verified that Carmi did in fact have the property and motorcycles in the names of family members.

Richards stated that he had accompanied Carmi several months earlier to meet the marijuana delivery drivers from Texas, in order to deliver cash to them. They delivered $150,000 in cash concealed in a Pepsi Box. Richards was able to describe one of the drivers as a white male in his 50's with gray hair and a glass eye. The affiant showed Richards a picture of Carl Barrett, whom Richards identified as the driver.

Richards stated that after his arrest, Carmi came by several times and stated that Richards should keep quiet as he was going to get everyone in trouble. Approximately three weeks prior to the date of the affidavit, Carmi asked Richards to meet him at a restaurant in Wentzville. Carmi made Richards lift up his shirt and leave his cell phone in the car, because he was concerned about being recorded. Carmi said he knew he was

8

looking at a long jail sentence and stated that he would be forced to give up his "Mexicans."

A utility check showed that electric utilities and telephone at the Residence was in the name of Carmi. The officers also confirmed that Carmi had provided the Residence as his residence for prior arrests and on other records, including driver's licence records, vehicle registration and personal property tax records.

The search warrant authorized the seizure of items including controlled substances, drug paraphernalia, records of the distribution of controlled substances, currency, financial records, travel records, indicia of ownership, and firearms.

Execution of the Warrant

The search warrant was served and executed on February 13, 2008. Defendant was present at the time the warrant was executed. The officers seized certain records, documents with drug notations, titles, photographs, bank documents, ammunition, high capacity magazines, and six brass knuckles. Certain of the items, including an address book, deposit slip, and insurance receipt, were located in an upstairs safe, that measured about 2' square. Govt. Ex. 3. The upstairs living area had a living room, bathroom, and two bedrooms, one of which was used as an office. The safe was located in the living area. Both the upstairs safe and the vault located on the first floor were opened by Defendant Carmi after the officers told them that they had someone to open the safe and explained the degree to which the safes might be damaged. Carmi opened the safes himself to avoid their being damaged.

## CONCLUSIONS OF LAW

A. <u>**Probable Cause for Search**</u>

Defendant asserts that the search warrant is facially insufficient and does not provide probable cause for the search. To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched. <u>Warden v. Hayden</u>, 387 U.S. 294 (1967); <u>Johnson v. United States</u>, 333 U.S. 10 (1948); Rule 41, Federal Rules of Criminal Procedure. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions. "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." <u>Brinegar v. United States</u>, 338 U.S. 160, 176 (1949). Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). Applications and affidavits should be read with common sense and not in a grudging, hyper-technical fashion. <u>United States v. Ventresca</u>, 380 U.S. 102, 109 (1965). Probable cause may be found in hearsay statements from reliable persons, <u>Gates</u>, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959); or in observations made

10

by trained law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948); United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003). While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive. Information contained in applications and affidavits for search warrants must be examined in light of the totality of the circumstances presented. Gates, 462 U.S. at 230. Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding. Id. at 236. Defendant contends that the affidavit in support of the search warrant is deficient on several grounds, none of which have merit.

1. Reliability of Informants

First, Defendant contends that the warrant was based solely on informant information and that there is no evidence that the informants were reliable. But as Defendant, himself, acknowledges, informant information may be sufficient for probable cause if it is independently corroborated. Draper, 358 U.S. at 313; United States v. Caswell, 436 F.3d 894, 898 (8th Cir. 2006). As the Eighth Circuit has noted, "when an informant's information is at least partly corroborated . . . 'attacks upon credibility and reliability are not crucial to the finding of probable cause.'" United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995) (quoting United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992)).

That is the case here. The search warrant affidavit recites that the police officers received information from an undisclosed informant or informants that (i) Carmi was

11

supplying marijuana to Richards, who was distributing it to subjects in Maryland Heights and other locations; (ii) they were transporting the marijuana from an unknown location in Texas to Maryland Heights; and (iii) the quantity of marijuana involved was approximately 100 to 200 pounds, delivered two to three times a month. The Troy police also received information that (iv) a delivery to Richards was going to occur; (v) Richards was leaving his place of work at Barnes Hospital prior to taking delivery; and (vi) the marijuana was part of a larger delivery which Carmi had just recently received from an unknown Texas source of supply.

This information from the unnamed informant(s) was all corroborated. The delivery was corroborated by the officers' surveillance of Richards and the seizures of marijuana from Richards and Sebastian on December 7, 2007. The interviews of Sebastian, Richards and Wheeler corroborated Carmi's involvement, the relationship between and roles of Carmi and Richards, the typical size and frequency of the deliveries, and that the marijuana came from sources in Texas. This provided a sufficient basis for probable cause. See Caswell, 436 F.3d at 899 (finding probable cause to search residence where information from unnamed informant that the defendant was involved in narcotic activity was corroborated by statements in the affidavit that an ongoing police investigation revealed the defendant to be involved with the use and manufacture of narcotics, and that the defendant had purchased five boxes of Sudafed and had methamphetamine on his person and in his car at the time of his arrest); see also United States v. Durham, 470 F.3d 727, 733-34 (8th Cir. 2006) (partially corroborated

anonymous tips regarding operation of methamphetamine labs and concern for welfare of child provided probable cause to search residence following death of child); United States v. Taylor, 238 F.3d 1036, 1039 (8th Cir. 2001) (finding corroboration of minor, innocent details sufficient to support probable cause where informant made statements against interest after being arrested). That Richards and Wheeler had been arrested does not undercut the reliability of the information provided. As the case law recognizes, that informants are often motivated by the hope of obtaining leniency regarding their own situations does not necessarily make them unreliable. See United States v. Underwood, 364 F.3d 956, 963 (8th Cir. 2004), vacated and remanded on other grounds (*Booker*), 543 U.S. 1108 (2005). Further, the information received from Richards and Wheeler was received in face-to-face interviews, was detailed and specific, and was against their penal interest, factors found to be sufficient for probable cause. See United States v. McAtee, 481 F.3d 1099, 1103-04 (8th Cir. 2007) (holding information received from wife who had been observed purchasing pseudoephedrine provided probable cause where statements were against her penal interest, and were detailed and specific regarding materials she had seen in her home as well as actions by the defendant); accord Gates, 462 U.S. at 234 (noting that "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the] tip to greater weight than might otherwise be the case"); United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (giving substantial weight to the fact that the informant information was received in a face-to-face meeting, allowing agent to gauge credibility). Moreover, the statements by

Wheeler and Richards (confirmed generally by Sebastian) corroborated one another with regard to all important details of the DTO. And other details provided by them, such as the robbery arrest and the fact that Carmi placed his property in the names of other family members, were confirmed by the officers. See United States v. Nieman, 520 F.3d 834, 840 (8th Cir. 2008) (finding probable cause where informants' first-hand information was corroborated by information from other cooperators).

    2. Staleness

Nor does the Court accept Defendant's assertion that the information contained in the affidavit was stale or impermissibly undefined as to time. As the Court noted in United States v. Horn, 187 F.3d 781 (8th Cir. 1999), the test for staleness is a flexible one, that depends on the facts of the case:

> "We have held that there is no formula for determining when information has become stale. . . . The timeliness of the information supplied in an affidavit depends on the circumstance of the case, including the nature of the crime under investigation; the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated."

Id. at 786-87 (citations omitted). In the context of an on-going drug conspiracy, the courts have recognized that intervals of several months will not give rise to a claim of staleness. See United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008) (refusing claim of staleness related to month-old information in cotext of an ongoing drug conspiracy); United States v. Smith, 266 F.3d 902, 905 (8th Cir. 2001) (holding that "[i]n investigations of ongoing narcotic operations, 'intervals of weeks or months between the

last described act and the application for a warrant [does] not necessarily make the information stale.'") (quoting United States v. Formaro, 152 F.3d 768, 771 (8th Cir. 1998)).

Here the officers had informant information that Carmi was involved in a large scale marijuana trafficking operation. That information was corroborated by surveillance and a seizure on December 7, 2008, just two months prior to the date of the warrant. The large scale nature of the operation was further confirmed by both Wheeler and Richards (and partially by Sebastian). There was little reason to believe that Carmi had abandoned his activities and destroyed all evidence of the operation, as the affidavit recites that following the arrest on December 7, 2008, Carmi came by Richards' residence on several occasions, to advise him that he should keep quiet. And just three weeks prior to the warrant being issued, Carmi asked to meet with Richards, took precautions against being recorded, and indicated that he might have to give up his suppliers. As such, the information contained in the search warrant affidavit was not stale. See Caswell, 436 F.3d at 899 (finding information not stale where information provided over two months before defendant arrest, where defendant arrested with methamphetamine and methamphetamine precursors); Smith, 266 F.3d at 905.

  3. Particularity

Defendant also contends that the affidavit was deficient because it failed to state the basis for many of the conclusions stated therein, such as how Richards knew the book was a "drug log," or the origin of any money seen at the Residence. But while wholly

15

conclusory affidavits are not sufficient to provide probable cause, it does not follow that search warrant affidavits must detail the exact basis for every statement made by informants, especially where, as here, the informants were providing information in face-to-face interviews concerning a long-standing narcotics trafficking operation. Moreover, in light of the volume and size of the drug and currency transactions that Richards and Wheeler themselves participated in, coupled with Carmi's own statements to them, it would be more than reasonable to infer that the quantities of cash they had seen previously derived from drug transactions and to conclude that such proceeds were likely to be found at the Residence. Further, given the substantial information regarding Carmi's organizing role in a substantial drug trafficking operation, it was also reasonable to infer that evidence of the type listed on the warrant was likely to be found at Defendant's place of residence. See Caswell 436 F.3d at 899-900 (recognizing that magistrate judges can infer, in the case of drug dealers, that evidence is likely to be found where the dealers live). Indeed, here the witnesses had observed such evidence in the Residence.

 For this same reason, it was also permissible to authorize a search of the upstairs -- including any safe -- and for the officers to search the upstairs safe notwithstanding the absence of any specific reference to that safe in the affidavit. The state search warrant expressly authorized the officers to search the Residence, including the upstairs, for such items as controlled substances, indicia of residence, currency, firearms, and notes or ledgers related to drug trafficking. "[A] warrant that authorizes the police to search a

home for certain objects also provides authority to open containers in which those objects reasonably might be found." United States v. Wright, 704 F.2d 420, 422 (8th Cir. 1983). As such, officers may seize, remove and open a safe found within a residence, when the safe is found in an area covered by the warrant. Id.; United States v. Johnson, 709 F.2d 515, 516 (8th Cir. 1983). Cf., United States v. Pennington, 287 F.3d 739, 744 (8th Cir. 2002) (holding that warrant authorizing the search of specific structures, also authorizes a search of "any other vehicles, structures, or property not noticeably separate from them.") (quoting United States v. Schroeder, 129 F.3d 439, 441-42 (8th Cir. 1997)). While securing the safe and obtaining a search warrant for its contents may be a better practice, it was not required. The items listed on the search warrant could easily fit inside a safe of that size, and could reasonably be expected to be found inside a safe.

   4. Good Faith

Even if there was some question regarding the probable cause or the degree of detail provided – and there is not – on these facts the officers were entitled to rely, in good faith, on the warrant. United States v. Leon, 468 U.S. 897, 922 (1984); United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001). Indeed, even if one assumes, arguendo, that the information contained in the search warrant affidavit was stale, the officers were objectively reasonable in relying upon the magistrate judge's authorization and the good faith exception of Leon would apply. See United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007) (holding that even if probable cause were lacking, good faith exception would apply where two months had lapsed between burglary and the issuance

of warrant for stolen property); United States v. Goody, 377 F.3d 834, 836-37 (8th Cir. 2004).

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. No. 16] be **Denied as moot**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Evidence [Doc. No. 17] be **Denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 24th day of April, 2009.